Good morning. Good morning. May it please the Court, my name is Richard Condit and I'm appearing here today on behalf of the appellant and relator Julie Reed. I would like to reserve three minutes of my time for rebuttal. I appreciate the opportunity to speak with you today as this is an important case concerning the application of a variety of provisions of the False Claims Act, an act that serves the United States in defending against fraud being committed by contractors. This case concerns allegations of systemic fraud by Keypoint Government Solutions in the performance of background and security clearance investigations for the United States. These concerns or problems raise concerns potentially implicating national security. Relator in this case, Julie Reed, was a senior quality control analyst for Keypoint and she brought to the company's attention a number of systemic issues of fraud which the company ignored and then Keypoint would like the Court to endorse is a rule that would provide for sweeping application of the public disclosure bar far exceeding the plain language of the statute and the intent of Congress. The public disclosure bar and the original source status issues are the two most prominent issues in this appeal. With respect to the application of the public disclosure bar, I think this Court will find on review of the record that substantially the same allegations or transactions as alleged by the relator were not publicly disclosed in the materials that are relied upon by the and fully done as required. I am speaking to that, Your Honor, but it's more than just detail. It's actual different fraud schemes between what was in the publicly disclosed information versus what was occurring at Keypoint. Like? Give us an example. So, for example, what Ms. Reed uncovered and reported within the company and then later to the United States government was the fact that the company would systemically avoid adhering to the telephone testimony protocol, which is one of the protocols that's required to be observed by the OPM Investigator's Handbook. That protocol requires that there are only limited circumstances under which a source that's being investigated or discussed in terms of investigation where that source can be contacted by telephone. And the reason, of course, for that kind of a protocol is that you want your investigators to be able to see people in most instances eye to eye and to be able to evaluate their credibility as well as the credibility of the information they're providing. So there was routine violation of that requirement, which Ms. Reed brought to the attention of the company. And we have outlined, or Ms. Reed has disclosed in her second amended complaint, over 140 instances of that violation, including identifying specific investigators and time these events have taken place and so forth. So that's one example. Another example. So they were communicating by telephone is what you're saying? Yes, they were not supposed to be communicating by telephone, but they were in order to speed up the process of conducting the investigation because the whole focus for the company is to produce a report of investigation as quickly as possible and submit it for payment. And that effort drove down the quality and drove the company toward fraud rather than ensuring that the quality of investigations that were being done was met to OPM standards. Even if that telephonic protocol materially added to the information, therefore going towards the original source, I'm stuck on why that would really matter for purposes of whether the public disclosure bar would apply to begin with. In particular, since we have language in our cases talking about trail on the trail of fraud. I mean, the reality is what you have, is it three or four entities in this case that are involved in this activity? I mean, that are involved in doing these backgrounds? So you have four entities involved in doing backgrounds. You have allegations that they're doing, that they're essentially short-shifting the government on doing these backgrounds. Why would it even be conceivable that the government would be guilty of gross negligence if they didn't knock on the door of Key Point eventually and say, you know, what are you doing? And in fact, Congress did. And Key Point may have denied it, but that didn't mean that they didn't knock on that door and they would not have continued to knock on that door. So on the public disclosure bar, I don't get it. Well, Your Honor, the point of concern that we have with the application of the public disclosure bar here is that the publicly disclosed information is not substantially the same. With respect to the variety of information that's relied upon by the district court and by Key Point, let me start with, for example, the 2007 through 2013 prosecutions of individual investigators. All right? Those prosecutions only involve those who did not implicate anything to do with their companies and certainly didn't raise any concerns about Key Point committing any fraud. So that's one of the areas. But if your investigators are not thoroughly doing the background checks and the investigators work for the companies, obviously the companies aren't doing the adequate background checks. Well, there's a difference, Your Honor, between doing an adequate background check and making a mistake as opposed to engaging in a systemic fraud. Well, one of the employees was a Key Point employee, right? Mr. Abraham was not a Key Point employee. He was an employee of Kroll. And the allegation is that Kroll later became Key Point Government Services. I don't know that that's actually correct. I believe that aside, let's look at Mr. Abraham's case. Mr. Abraham's case concerned problems with his investigations or false statements associated with his investigations that occurred in 2005 and 2006, having nothing to do with Key Point. And those false statements concerned not just Kroll, but also two other companies that he worked for at the time. So the government was pursuing him because he was apparently committing fraud in a number of places that he worked. Well, that's one data point. We're talking once the data points start adding up, that's the issue. I mean, we've got the one criminal prosecution of him. We have the media reports that are talking about the fact that there are companies that are being held. And we're not talking about a large number of companies. We're talking about companies involving and defrauding the government relative to background checks. How much more do you need than that to put in, no, our language, trail of fraud? How much more do you need to be on the trail? Well, Your Honor, what was said in the publicly disclosed information is very important. And what facts, if there are any, that support it is very important. So I would submit, Your Honor, that, for example, in the newspaper stories, the newspaper stories pre-2013, when the Usas case was unsealed, but pre-2013, the newspaper stories focused on primarily that we have a problem with background check investigations because there are a lot of them. They make mistakes. There are issues of that nature. And Congress and others are always concerned about being able to process people through fairly efficiently in order to get to the point that they can actually serve either as a contractor or as a government employee. So that's where those newspaper stories go. Those were in 2013 and Key Point was specifically mentioned in. No, I was talking about pre-2013, but I'll turn to 2013 stories, Your Honor. So the 2013 stories mention Key Point, but they don't mention Key Point as engaging in fraud. They mention Key Point as one of the contractors that are providing services to the government. There's no allegation to indicate to the government or to Ms. Reed or to anyone else that, in fact, fraud on a systemic level is being committed by Key Point. The only fraud on a systemic level that was identified associated with a company is when the United States Investigation Services case was unsealed, and that was unsealed in the latter part of October 2013. Well, I find it curious that you use the congressional testimony of Key Point to benefit you. It seems to me that, if anything, it underscores the fact that you've got a small number of entities. There's enough out there that they're going to go out there and they're going to investigate every entity, and that means that, you know, that equals trail of fraud. I mean, you've got fraudulent allegations against uses. You've got a small number of entities. All of the entities are following the same playbook. I mean, why would it not be logical to say, if we've got this problem, this major problem with this one company, that we better be sure we don't have any problems with any of the other companies? And the point of the inquiries and the congressional hearings and such was to discuss not systemic fraud by the other companies, but what can we do to make the process better. The congressional hearings that you're referring to that are in the record with respect to or referred to by the district court with respect to the so-called public disclosure of this information is really not about fraud. It's about how do we ensure the quality control? What metrics should be used? Well, when you say how do we make it better, there is in part then assumed that things are bad as they presently are. That's why you're having the discussion about how can we can make them better. Right. You assume, but you don't assume fraud, Your Honor.  And again, would the not being done well be enough to cause you to look into the only three companies that do this? To see how they're doing it? Yeah. I understand, Your Honor. But, again, the standard is not whether or not there was some, you know, general opinion out there that there might be fraud going on in some way. There was no public disclosure that made it clear in any way or even vaguely referred to Key Point as engaging in fraud. And as Your Honor has pointed out, Judge Holmes, Key Point, in fact, denies and claims that he was following the letter of the requirements. But it was asked that question in the congressional hearing, right? It was asked. Actually, I don't know what question was asked because the testimony that we've referred to the court was testimony that was in writing. So I'm not exactly sure what was said in the open colloquy with the committee of Congress. Well, in the written testimony, they addressed, did they address whether they, in fact, were engaged in fraudulent conduct? They didn't specifically, as I recall, they didn't specifically address fraud one way or the other. They simply said, we do our investigations by the book. And so with respect to these issues. Which is an obvious testimony to be given representing the company, right? We're good here. Well, right. We are good here. Look away. And remember, Your Honors, the issue, what was going on at that time was there was a lot of concern about what had unfolded with Eustis. And there were three things that were going on with Eustis. One or two were that significant investigative concerns around Edward Snowden, because Eustis investigated his background, and around Aaron Ariels, I believe it was, the Washington Navy Yard shooter. So that was combined with the unsealing of the Eustis case, which caused a lot of reporting and other things about, okay, what are we doing with this system? How are we properly monitoring it? And so forth. But, Your Honors, I submit there is nothing in the record that establishes in any way that Keypoint was engaged in fraud or might be engaged in fraud, other than the fact, as you point out, that they are part of a small circle of companies that were doing this service. But if we were to apply that rule to other contexts, let's take, for example, let's say we had a couple of hospitals that were up-coding. They were committing fraud by up-coding. And one hospital is up-coding the services it's providing, for example, to cardiac patients. Another hospital is up-coding the services it's providing to the ER. And the cardiac patient up-coding is disclosed. Does that mean that because it's up-coding, that it's barred, that the second case would be barred? Why wouldn't it be? Tell me what case would categorically say that's not right. If you've got two companies in a market, one, they're both engaged in up-coding. They're both engaged in the same kind of fraud. They're doing it as it relates to different procedures. Why isn't that enough for the government to say, I'm going to find out whether that one over there, B, is up-coding too? I mean, that's why is it, what case says that's not enough for the public disclosure? Well, Your Honor, I think we have to look at this from a common sense and practical perspective. The government gets lots of information or sees lots of information that it could consider investigating. It has limited resources. Three or four companies is what we're talking about, right? But, Your Honor, it's not going to go and investigate a company if it doesn't have some more concrete information indicating that there may actually be fraud at issue. Congress asked for it. Congress inquired, didn't they? Congress only inquired as to the process and procedures and whether or not the OPM, the Office of Personnel Management, was overseeing and what steps it could do to better oversee these issues to make sure that we didn't have another Edward Snowden, that we didn't have another Washington Navy Yard shooter, things of that nature. So these, this public disclosure issue is that there's simply not a factual basis for claiming that there was an actual public disclosure that, I guess you would say it this way, there was an actual public disclosure that Ms. Reed derived her lawsuit from. You may want to look at your time. Yes. Yes, Your Honor. And so I've reserved some time for rebuttal and all. Well, your time was on the clock, so. Okay. You're in charge of your own time. All right. Thank you. Thank you. Your Honors, Robert Bloom on behalf of Key Point Government Solutions. Your Honors, this case is neither complex nor new, and in fact, it requires this Court to make a standard application of the public disclosure. The allegations raised by the relator simply don't materially add to anything that's in the public disclosure. This very same fraud scheme that the relator alleges was in the public domain, Key Point put in the record 18 previous public disclosures, many of which actually identify Key Point. And as Judge Holmes, as you noted, even if not identified by name, it is a very small industry with three key players. Whatever new information the relator does add, it is not material and did nothing to impact the government's facilities. So you're saying that she's alleging that Key Point was committing fraud, and you're saying the fact that Key Point was committing fraud is in the public domain? No, Your Honor. We're not. Because I just was wondering what was happening to Key Point since they were doing these things that everyone admits to.  What was in the public domain were the allegations of general fraud in the industry, a very small industry, where, as Your Honor pointed out, the government was on the trail. The intense scrutiny in the background investigation industry began in 2009 and intensified, as counsel noted, in 2013 with Snowden and the Maryland Navy Architect. There are allegations throughout that time period about the very things that are listed in the relator's complaint, cutting corners, rushing to investigations, submitting incomplete, erroneous reports. In fact, in her complaint, the relator says that Key Point performed, quote, improper, inaccurate investigations. The USIS complaint, to name one, in paragraph 36 says the field investors had incomplete and inaccurate investigations. She also alleges Key Point failed to perform case reviews. The USIS complaint, as one example, said that there were no reviews, that they were deceived OPM to believe that they were receiving quality reviews. Very same allegations disclosed months before the relator brought her action. And where was there anywhere but in her complaint where they talked about these telephonic protocols? That's certainly not in USIS's complaint. It is not, Your Honor. And I would argue that that is a point that goes to whether it's materially asked. There's no question that she added facts into the public domain. These hundreds of years ago. And why aren't those facts material? And if they are material, she's an original source, right? If they are material, she would be an original source. But they are not material, Your Honor, for this reason. Whether or not a telephone interview occurred as opposed to an in-person interview occurred is a fact, is a detail, is an example of a methodology of how a fraud might have occurred. The materially asked provision, which Your Honor is referring to, requires that the fact or transaction or allegation has an effect on the likelihood or actual behavior of the recipient. That's the material standard from Escobar in the Supreme Court. It's repeated in numerous instances here in the Tenth Circuit. And if I know about a theory that I didn't know about before, why wouldn't that affect my scope of investigation? Your Honor, the cases are clear. Well, certainly with regard to the public domain. I read the cases. They are pretty clear on original source matters. And we haven't made a determination what materially means, have we? You have not in the context of the original source. But you've dealt with materiality before. The new details, for example, whether or not an individual is conducting a telephone, leaving aside for a moment whether that constitutes a fraud, whether or not the quality of the information obtained by a telephone interview is any different or less important. Well, well, wait a minute. If the interviewers are saying, we conducted all of these interviews in person. We looked at the people we were interviewing in the eye, and we are absolutely certain they were speaking the truth. We relied on their statements. Now, isn't that a whole different picture than if you talked to someone on the phone? And isn't that a false representation that would be a basis of fraud? If they are falsifying that information, yes. But the allegations in the relator's complaint really focus on two things. One, not that they said they did in person but did it on telephone, but that they did it in telephone in opposition to some protocol that was in place. And number two, they say that the interviews, and she listed dozens of them, took only five minutes, when in relator's view they should have taken seven minutes. No allegations in the complaint that those were material at all to the claim. Your suggestion, and perhaps I'm misreading this, but your suggestion is that these are minor points. The reality is OPM, by definition, made them important, made them material. OPM is the one who set up the protocol. OPM is the one who said, you know, these are the kinds of interviews that you should do. These are the conditions that are the threshold for conducting a telephonic interview. And they blew right past those threshold points. So it's not a question of whether we think it's important. To OPM, it was material. Your Honor, with all due respect, we're talking about different aspects of materiality. For this purpose, public disclosure bar and the original source, the question is whether allegations made by the relator are materially added. What's in the public domain such that the government would be better off in its investigation? I got that, but we have a new theory, right? Why wouldn't the government be better off because they're investigating a new theory that they didn't have before? It's not a new theory. It's fraud in the background investigation and how that fraud is conducted. And if you look at certain cases which discuss this very point, they tell you that examples and details are not sufficient to be material in the analysis. For example, the district court relied on the Winkleman case in the First Circuit which talks about whether or not there is additional evidence of additional fraud, new schemes. The Seventh Circuit, the Ninth Circuit all talk about whether it adds value to what the government already knew. Whether these are hidden facts that the government literally would jaw drop and say we need to change direction. No, that's not what that – influence decisions is not jaw dropping. And Winkleman, which I'm looking at right now, speaks of scienter as possibly being a material fact. Was there anywhere in the public domain where there was any suggestion at all that Keypoint knew of this fraud? I would suggest there was, Your Honor, in the fact that they called Keypoint before Congress. And that Keypoint denied it. So where was it that anyone had ever provided any evidence to suggest that Keypoint knew anything? First of all, I would challenge the allegation that there is sufficient allegation of scienter in the complaint. But assuming that there is, for our purposes here, there are two places for this court to look to determine whether the government was sufficiently on the trail at Keypoint. Most primarily. First, in the fall of 2013, before this complaint was filed, there was an opium audit in which the government itself was inside of Keypoint's tent looking around. And they made findings and determinations. But there's no inference that this court needs to draw as to whether the facts give rise to whether the government's on the trail. We know the government was there. They were in the house. The allegations raised in this complaint would be, for example, if there was a search of a home, all the relator did is say, hey, look in the bedroom. I know you're standing in the living room to search this home. Look also in the bedroom. The position of Keypoint and the cases to support this in our submission is that the government's there looking at fraud in the background investigations industry. And if that were true, the original source exception would have no meaning at all. Because how under this in the bedroom analogy would, how under that situation would original source mean anything? If what you're saying is I'm at Keypoint, I'm looking at them, so all is open. Any fraud that Keypoint would have known about, that should be covered and would not be subject to the original source. How does that work? And in our cases, I think Winkleman alluded to the fact that you could get a point, not our case, but the First Circuit's case, alluded to the fact that you could render that whole exception a nullity. You could if you ignore it. And I would point out. How does your example not ignore it? Well, first of all, it's a two-part assessment. And I want to make sure that we're focusing on the right aspect of the public disclosure. The public disclosure is in the first instance. This Court needs to determine whether or not the allegations in the religious complaint are substantially similar to those in the public domain. And I would suggest that this Court under Sandia looked at this very point, In Re National Gas looked at this very point. And they looked at an industry that was small and identifiable and determined whether or not the government, given what was in the public domain, could be sufficiently put on the trail of potential fraud. I would submit that that finding here not only is supported by those cases, but here we have Keypoint actually identified as the fact. The second inquiry, if that is the case, allows the relator to proceed if she can demonstrate that she is an original source. And because the independent aspect was set aside by the district court and district court determined that she did not materially add, then let's look at that. Whether she – that is a two-party inquiry in my submission. Whether the facts in the religious complaint add to what's in the public domain. And I would concede that there are many facts in the religious complaint that are added to the public domain. As Your Honor noted, for example, the use of the telephone and the names of these investigators. What is – where the relator fails, however, is whether or not the name of Jane Doe making a telephone call instead of doing an interview. The name of Jane Doe, investigator, making a five-minute interview instead of a ten-minute interview. That's not what I'm asking you about. I'm not asking you about names. I'm asking you about a theory of fraud. Those are two different things. If you had theory A in the public domain and then in the relator's complaint, she had ten people that we didn't know about who did theory A. Winkleman would tell us anyway, if we're going to look at Winkleman, that's not material. That's not what we're talking about. We're talking about a different theory. And I am inquiring about original source only. That's what this is – that's what we're talking about. Understood. The relator sets forth three theories of fraud. Improper and inaccurate investigations, failed to perform case reviews and quality of control checks, and false by corrective action reports. Those three methodologies were used, according to the relator, to defraud the federal government. What you're talking about, Your Honor, in terms of the use of the telephone, is a mechanism of fraud, not a new fraud scheme. And Winkleman, as well as other courts, including cases at the relator's sites. For example, the In Re Majestic case talks very specifically – Majestic Blue Fisheries case. And the relator cited it. Oh, it did. It talks about who, what, when, where. If you want to go Majestic, you've got a real problem, it seems to me, because there's a lot of who, what, when, where in the relator's complaint that we don't have in the public domain otherwise. I disagree, Your Honor. I think the Majestic Blue Fisheries goes to this point. And that is, there was, in Majestic Blue Fisheries, a surreptitious scheme where the government could not uncover by itself the names and ownerships of LLCs, how money was transferred back and forth, revelation of pseudonyms in use, the details that were unavailable to the government through ordinary and reasonable investigation. And without the relator in that case and the relator's information, the government would not have been able to uncover that. It materially changed the government's ability to investigate that fraud. Your Honor, the facts that the relator sets out, the use of the telephone, these are met or methodologies used, they're transactions in pursuit of the very same fraud in the public domain. And that fraud is incomplete and inaccurate background investigations. But isn't that – isn't using a telephone a way to hide discovery of fraud? I mean, are they making a record? Are they stating the record? Are they saying we talked to this person? Or are they saying we called them on the telephone? There may be no way to discover what. Well, the person on the telephone is in the record. In fact, the relator says that she identified the telephone and then when determined that the subject of that call was within a scope of mileage, that the investigator should have met them in person instead of talking to them. Well, I realize that. But if the feds are on the trail of fraud and a part of – I mean, I don't – I see that as a separate fraud if you're conducting – writing down what occurred in an interview and not disclosing this by telephone. You're specifically violating the regulation. But that's not the allegation's complaint. She doesn't allege that they didn't say that they used the telephone. She says that they used the telephone inappropriately. And again, leaving aside two very important points. One is whether that's even a fraud in and of itself. And two, whether that's nothing more than a contract breach as opposed to fraud. Because it's not irrelevant to note that nowhere in the relator's complaint does she allege any claim to the government. She alleges a series of events that she claims violate the contract. And she claims as a – in her role as an investigator, she uncovered that the use of the telephone was inappropriate given the guidelines that she sets out. We challenge that – those underlying facts, but even assuming them to be true. Nothing – there's nothing new here except details and without any new scheme to defraud. Again, the underlying scheme is inadequate and inappropriate background investigation. She alleges they're inadequate because it was a telephone instead of in person. But nonetheless, the very same scheme was where the government was. I want to take 10, 15 seconds to speak to her retaliation claim because it does bring this all together. She was, as Relator's Counsel noted, a senior quality control analyst. She was asked by Keypoint to engage in this telephone testimony program. She was asked by Keypoint to review all of the things that she reviews. In her complaint, she talks about her review of those. She talks about her reporting of those to her chain of command. Never once in the complaint does she allege that she told anyone within Keypoint that there was a fraud in the government. All she did was review a contract breach. The district court used a lot of pre-2009 cases. The district court used pre-2009 standards. Why isn't that, on its face, erroneous? The facts, and I'll, due respect, I'll answer your honest questions even though my time is up. The difference in the old statute to the new statute does broaden the scope. But as far as, in order to be, in order to retaliation, you need two things. You need a notice and protected activity. The protected activity here is what's the focus. And that is any failure under the old statute or the new statute to give, to tell your employer or to do something outside of your, of your ordinary job duty. There's a presumption that she's acting within her job duties, whether it's under the old statute or the new statute. And there is no question, there's nothing in the complaint that alleges that she did anything beyond what she was required to do in her, in the course of her employment. And then no, and then. It alleges she went outside of her chain of command. Only to report eight contract violations and not, no threat that she was going to the government. No threat that any of this was an actual fraud on the government. Only that there were contract breaches in her view. And that is non-protected activity. Reporting contract breaches in the course of your employment is, as a compliance officer. As you know, there's a D.C. Circuit case that says that if you go outside of the chain of command, that you actually are giving notice. That you are doing, that you, that this is your, that is, that this is protected activity. Now, you may not like that case, but the fact of the matter is the D.C. Circuit has spoken to that issue. And they have pled that's exactly what she did. But, right. But the, but in order, but the notice that you give has to be notice of a, something related to the False Claims Act or in furtherance of. And simply going, whether it's in your chain of command or outside of your chain of command. And identifying contract breaches without any mention of fraud to anybody is inappropriate for a retaliation claim. And doesn't show the causal connection needed. Thank you. I appreciate the additional time. Would you like some additional time? It's always hard to know that you're going to get additional time without notice. I mean, I'll take maybe 30 seconds or a minute of the court's time. Okay. If you don't mind. I'd like to address a couple of things raised by counsel. And I think maybe raised by the court as well. And one of those is this reliance on two of this Court's decisions. One, natural gas royalties. And another, the Sandia case. Your Honors, I just want to make clear that those cases simply do not apply to this situation. And here's why. The public disclosures in those cases disclosed that there was company-wide, company-sanctioned fraud in each of those cases. That's not the type of public disclosure that we've had here. In natural gas royalties, it was about mismeasurement. Hundreds or maybe, excuse me, dozens of companies mismeasuring. With respect to Sandia, it was about DOE laboratories misusing or improperly using funds. There was no individual issue. It was an issue of the organizations themselves. And that's why the application of those two cases should not be considered in this Court's assessment of the issues here. Unfortunately, it was conflated in Key Point's argument and conflated by the district court. And I think it presents an inappropriate standard for determining if there has been a public disclosure in this case. Thank you. Thank you very much. Thank you both for your arguments this morning. The case is submitted. Our final